The next matter on our calendar is Phelps v. Bosco and the Federal Bureau. Thanks. I'm sorry, Your Honor, as I've taken some medication, it just dries my mouth. Louis Oliver for Frederick Phelps. Mr. Phelps is a gentleman who was a truck driver all his life. He's recently retired. He's in his early 70s. He grew up in the rural area of Columbia County, upstate New York, and grew up as a hunter. For approximately the last 20 years, he has not been able to purchase a firearm because of the Brady Act and his admission to Central New York Psychiatric Facility in 1996. And in this action, this petition, he's attempting to vindicate his right under the Brady Act to purchase a firearm because neither of the admissions that the defendants are raising were a commitment. Neither one of them were a commitment to a mental institution. The defendants on this appeal are relying heavily on the stigma that attaches to almost anybody who enters the doors of a mental facility. They're relying on this court's decision in Waters, though, aren't they? No, Judge, they're not, because Waters makes it clear that the admission in Columbia Hospital in 2005 under Section 937 was not a commitment. And they don't deal with an analysis of the Waters case, and they don't deal with an analysis of the difference in the statutes between Mental Hygiene Law 937 and Mental Hygiene Law 927. Waters says that 927, the admission, is a commitment. Yes, Your Honor. So is what you're saying that 927 and the provision under which admission was here was made, 931, are materially different? Yes, 937. Yes, Judge. Forgive me, 937. Forgive me. What's the most significant way in which they are different? Well, number one— 939. I misspoke. I misspoke, too. Well, first of all, Waters requires three physicians, one to admit and two to certify. And there is no expression under 927, which was determined to be constitutional in Waters, there's no observation period built into that statute. In section 939, it's completely different. You know, and the basic problem is that the defendants throughout all—I mean, New York is an almost unique state because all states, almost all the other states, require a judicial determination or a determination by a board or commission to commit somebody to a mental institution. 927 at issue in Waters does not and yet was held by this court to be a commitment. I'm just saying it's unique. It's almost unique, that's all. It's an exception. And so under 939, that was different from Waters, that he was admitted in Columbia Hospital. First of all, the structure of the statute provides for an observation period. The purpose of this statute is not involuntary treatment, as it was in 927 in Waters, but the purpose of this statute, this statute is called in 939, is emergency admission for immediate observation, care, and treatment. And Congress has made it clear that an admission to a mental institution  And that's clear in the regulation that was 27 CFR 478.11 that was promulgated by the ATF, the Alcohol, Tobacco, and Firearms Agency of the Treasury Department. And that regulation, which Congress approved after it was promulgated under the Congressional Review Act, that regulation requires, specifically states, that a commitment does not include a person in a mental institution for observation or a voluntary admission. But the text of 939 isn't limited to observation. It's conjunctive. It's observation, care, and treatment for a condition that, quote, is likely to result in serious harm to himself. So if this was just observation, I would understand the distinction, but the statute goes beyond that. Well, the statute has steps. The statute has a process. And the structure of the statute is that when a person is brought in, they're evaluated and they're brought in for observation. And the statute provides that in order to be held for more than 48 hours, you need to have a medical doctor and a psychiatrist within 48 hours. And then the statute provides that if those two find that the person needs care and treatment, then he can be held for up to 15 days for observation. And then the statute provides that even if the patient demands a judicial hearing, and there is a judicial hearing, and the judge makes a finding, that adjudication is not a finding of mental illness, but is only a finding that the person needs care and treatment. And that decision has to be made within 15 days. So the structure of this statute is different. And so there's, in effect, a 15-day observation period that is built into the statute. And that is made clear by the language in the statute that at the end of the 15 days, if the patient continues, is willing to remain in the facility, that he would remain as a voluntary patient. That's the language of the statute. At the end of the 15 days, if the patient agrees to stay in the facility, he remains a voluntary patient. And the only time that he would be an involuntary patient is if two physicians certified him under Section 927, which the court approved in Waters. And that comes after 15 days. So why would it be, why would you need a Waters commitment if he's already committed when he walks into the facility? Your argument in seeking injunctive relief to get your client off of the NICS list is one of constitutional avoidance, right? You're asking that the statute be construed to make your client's situation other than a commitment so as to avoid what you contend would otherwise be a constitutional problem. Do I get that right? Yes, Your Honor. Okay. You have not, however, argued, in fact, that non-removal of him from the list would violate the Constitution. There isn't a constitutional claim as to the injunctive relief that you seek here, correct? No, Your Honor. The Second Amendment provides that there is a right to bear arms, and the Supreme Court has held that that applies to the states. I understand, but there's no constitutional claim here in this case. You've made purely a statutory construction argument drawing upon the Second Amendment, but in the end, if we concluded, contrary to the argument you've just made, that under Waters, 939 travels with 927 and there isn't an ambiguity to which to use the tool of constitutional avoidance, you don't have a second argument here that there's a constitutional violation that results. I looked at your complaint. I just don't see that. Of course there's a constitutional violation because he has a right to purchase. If he wasn't committed, he has a right to purchase a firearm, and he can go to the gun shop in upstate New York. They're all over the place, and he can register, and he'll be cleared, and he can buy a firearm. But because of the unconstitutional listing of him under NICS, he can't do that. That's a violation of his right to bear arms, of his right to have a rifle, and of his right to hunt, and of his right to enjoyment of life. And there's other reasons. Not only is it the statutory structure of 937 that's different from 927, but their position is, and necessarily must be, that under any one of these statutes in the mental hygiene law, and New York has a whole bunch of them, five or six of them, and they all have different requirements, their argument is that if somebody is brought into a facility for observation, and they're in the facility for ten minutes, they're committed. They don't make any distinction, and they argue this very powerfully, that any admission to a mental facility is a commitment, and that is directly contrary to the intent of Congress. Counsel, your time has expired. You have reserved three minutes for rebuttal. We'll turn to the state defendants. And let me ask you the question that opposing counsel just ended with. Any admission is a commitment? Is that how the state law reads? That's not true, Your Honor. The state reads an admission under 9.39 to be a commitment, but there are a number of statutes in Article 9, as my adversary just spoke of. To the extent that there's a distinction between admissions for treatment and admissions for observation, I would direct this Court's attention to mental hygiene law 9.41, 9.43, 9.55. These would be observation statutes. What these statutes do is authorize somebody to bring a patient to the hospital for an evaluation, and the purpose of that evaluation is to determine whether or not that person needs inpatient treatment and presents a serious harm. So the observation doesn't necessarily mature into a commitment. That's correct, Your Honor. Here, Mr. Phelps has been observed by an admitting physician, and he's been found that he needs inpatient care and treatment, and that without inpatient... That's when it becomes a commitment? That's when it becomes a commitment, Your Honor. Frankly, Mr. Phelps could not have remained in this hospital for 10 days without first an admitting physician and then a psychiatrist finding that he needed inpatient care and treatment, and that without it he would pose a serious risk of physical harm to either himself or another person. Now 9.39, as it relates to Phelps, Phelps is the typical 9.39 patient. He's brought in in the grips of an acute psychiatric emergency, and that's a huge distinction between 9.39 and 9.27. 9.39 represents emergency situations. He's put into the hospital to receive stabilizing care and treatment, and over the course of the 10 days he does receive that treatment. The fact that he... And when he is discharged, it's not because he doesn't have a mental illness. It's not that the mental illness went away. It's because the danger subsides to the point that an inpatient setting is no longer necessary. That's because he had treatment during those 10 days, you argue? That's correct, Your Honor. That treatment and that therapeutic environment in which he received treatment stabilizes him to the point that the acute emergency in which he poses a danger has dissipated to the point that he can now go into the community. I'll note that when he's discharged, he's actually discharged with recommendations for follow-up care in an outpatient setting. So the continuum of treatment, it maintains in the community, but the emergency has now dissipated. Now, one of the aspects of Waters is whether or not the commitment would be consistent with federal gun control policy. The state's position is that it would be so consistent. It's difficult to ignore the facts here. Mr. Phelps is committed after making credible threats against the lives of government officials. He's brought into the institution with shackles after having to be tased, and when physicians talk to him, he's virtually incoherent. But on the statutory issue here, regardless of the facts as to him, what's your position as to whether the differences between 939 and 927 make Waters inapposite or apposite? We would believe that Waters is apposite. We construe Waters as having a two-part test. So when we were speaking about commitment and observation just before, that is the part one of the test, whether the state recognizes it as commitment, and I was speaking about the substance of the statute, that he's actually receiving treatment. I'll note also, however, that in other contexts, both state courts and this court have referred to 9.39 hospitalizations as commitments, and in fact, if you look at 9.39G, the statute refers to itself as a commitment statute. So the reason we construe the second element of Waters, the test announced in Waters, as consistency with federal gun control policy, and that's where these facts matter, because as I said earlier, it's our position that Mr. Phelps typifies the 9.39 patient and the emergency situations that that reflects, and a person who has the kind of emergency that Mr. Phelps suffered from, a person who is committed under those types of facts, those facts easily reflect the concerns that drove Congress when it enacted 9.22G.4. So this case doesn't appear to raise the question of whether somebody who once was committed but claims now to have gotten better, for want of a better word, what the procedures would be. It doesn't appear that there's been any effort made by Mr. Phelps to remove his name from the NICS registry. In New York, what routes, if any, would be available to him if his claim is now in his 70s that he's safe and sound and the historical commitment shouldn't bar him anymore? Somebody in Mr. Phelps's position has three avenues for relief that would protect his rights. The first two are an attack on the hospitalization itself. So once he's in the hospital, he has a right from day one entering the hospital to demand a hearing, and that hearing has to be held within five business days. If he's unsuccessful there or where he is here, he rescinded the request for a hearing. Post-discharge, Mr. Phelps has another avenue under state law. That's Mental Hygiene Law 33.14. It's a proceeding to seal his records, and one of the bases for sealing the records would be to attack the commitment as erroneous. So, for example, if he was to enter the hospital apparently in the grips of an acute psychiatric emergency, but it turned out to have a medical cause. I understand that sometimes kidney problems and liver problems can produce psychiatric effects. He might be able to contest the basis of the hospitalization and get an order sealing that. I'm advised by the Office of Mental Health that when it receives a sealing order, it then transmits that order to the National Instant Background Check System. The third option... Does that then remove the original information about the commitment? For the purposes, as far as the state is concerned, it does. I was careful to say that we transmit it to the federal government for the federal government to do what it will because the federal government would actually have the final say over that. But for purposes of state law, if you get an order sealing your hospitalization, according to 33.14, it is as though the hospitalization never occurred within very narrowly defined circumstances that wouldn't apply here. What was the third option? The third option is a Certificate of Relief from Disabilities. And in other cases that have taken up the issue of commitment, Certificates of Relief from Disabilities have come up frequently. In Waters, that was one of the protections that was reflected. That's actually the Federal Certificate of Relief for Disabilities, which for administrative reasons has been rendered inoperable. However, in 2007, when the NICS Improvement Act came out, Congress encouraged each state that bought into the program to develop its own procedure, and New York does have a procedure. I'm advised that it's a workable procedure. Mr. Omich has informed me that since 2011, it has granted 35 applications and denied 21 applications. So to the extent that Mr. Phelps believes that since 2005, he's now in a position where he could safely possess a firearm, this is certainly an avenue that would be available to him. I'll note that under the facts of this case, he was encouraged to pursue a Certificate of Relief. He did turn in papers for a Certificate of Relief. The Office of Mental Health wrote him back, saying that they wanted him to submit more information, because it is a fairly thorough process. Is that route still available to him? Yes, it is, Your Honor. The way that the Certificate of Disabilities process works is that you have a right to apply each year. So if you're denied, you have to wait a calendar year before reapplying again. Another option, if you didn't want to wait the calendar year, is that you could obtain judicial review of the denial of a Certificate of Relief. But given the length of judicial review, my understanding is that most patients who pursue this process simply wait another year. And I'm also advised that many patients have, even if denied the first time, have been successful on their second or third occasion. Thank you, counsel. Thank you. We'll hear from the federal defendants. Good morning. Abby Wright on behalf of the federal defendants. I don't want to be repetitive of the arguments that have already been made, but I'd be happy to start with the differences, the immaterial differences in our view between 927 and 939. 939 requires that the initial admission be a staff physician in the emergency room who determines that care is needed, immediate care is needed, and there's a substantial risk of harm to self or others. That is confirmed by a psychiatrist within 48 hours. Under 927, as Mr. Phelps points out, there are two physicians required, but that makes sense because the 927, the initial call-in could be from a relative, a roommate, a friend. Under 939, as was the case here, it's a list of – here it was a director of community mental health services. I think it can also be a peace officer and some others. But it's a person with a more official position who has some expertise in making these kinds of determinations who calls in a pick-up order. So I think it's entirely consistent. 939 and 927 are entirely consistent in the waters. The reasoning in the waters decision applies equally to Section 939. I would be happy to answer any additional questions. I have none. Thank you. Thank you. Mr. Oliver, you retained three minutes for rebuttal. Could you start by telling us whether Mr. Phelps has applied for relief from disability? He started to apply, and then he decided that it was better to pursue the statutory relief provision in the Brady Act because this admission for three days was not a commitment. One of the reasons why he decided is because the particular person who made the decision, the so-called NICS officer of the Office of Mental Health, she is the person in charge of the committee that decides whether these certificates of disability will be granted. And so he decided it was better to pursue the statutory remedy under the Brady Act. He still has the right, though. Should he fail on the statutory challenge? Well, we hope that he doesn't, and we hope that Your Honors will take a look at, in addition to, well, let me just say that the state's position that they argued before you that there was differences, and there was differences between the statutes, they do make a distinction between admission for observation and admission for treatment. It's not the same position they took in their briefs. Can I just come back to Judge Pooler's question? Is there some reason now why he would be unable to persuade the decider that he is, in fact, eligible for relief from disability? Are there some facts about his present situation that would call into doubt his ability to get that relief on the merits? No, there isn't, but he doesn't want to have to go through that process because he was never committed, and Congress has made it clear. It's easier to appeal this to the Second Circuit than filling out the forms for the state? It's less burdensome? Well, you know, I guess the truth is that Fred is a born-again Christian, and he believes very strongly in the law and following the law and God's law and the government's law, and this maybe isn't in the record, but he wants to enforce his right because he was not committed, and he does not want to have the stigma of having been determined that he was committed. And if you look at it, it's also not true that the psychiatrist here at Columbia Hospital certified Mr. Phelps. That is totally false. The commissioner promulgated the regulation and the Form 474, which requires not just the admitting physician to sign the certification, but on page 2, it requires the psychiatrist to sign the certification, and Dr. Plotkin at Columbia did not sign the certification, so there is no certification by a psychiatrist. And what the court below argued was that the commissioner didn't know what he was doing when he promulgated this form, and the court basically substituted its expertise and its judgment for the judgment of the commissioner of OMH, who requires the psychiatrist to sign this 474 certification, and there is none in this case. Parties admit that Dr. Plotkin did not sign the certification. Was it an oversight, or why didn't he sign it? That's their problem. That's their burden. They didn't come up with it. Of course it's not an oversight. What he did was he started to write a discharge summary on the second day that he was being observed, and there was never a treatment plan for Mr. Phelps. They didn't give him any treatment. There was no treatment plan. The attorney for the state said that he did get treatment, and that's why he was able to be discharged. There's no treatment plan. There's no evidence that he received any treatment. What the court below said was that because he was in a different environment and he went to meals and he followed directions and he did what he was told, he went to meetings when they told him to go to meetings, that that was treatment. But he never had a treatment plan to cure his so-called problem. The psychiatrist never found that he was mentally ill. The psychiatrist in the discharge summary said he was not mentally ill. You know, he had some problems and some diagnosis, but it was not a diagnosis of mental illness. And... What about the incident that brought him into the hospital in the first place? The incident that brought him there in the first place, wasn't that a mental breakdown issue? No. I mean, certainly the person who requested that he be picked up and brought to the hospital, obviously they thought there was something that needed to be looked at. But that's not a compliance with the statute. It's not a finding by a doctor. It's not a finding by a psychiatrist. It's just some concern that... And Mr. Phelps denied that he made any threats to any public official, as the state contends. And there's no firsthand evidence that he ever made any threats to any public official. There's just something on a piece of paper that says that. Didn't he have an opportunity to challenge just those facts while he was in custody, while he was being held? And didn't he initially try and then forfeit or forgo that opportunity? Well, yes, Your Honor. He did, as soon as he was told, the same day he was admitted, or maybe it was the day he was admitted, he got the notice about his right to a hearing. At 8 or 9 a.m. the next morning, the next day, he filed a request for a judicial hearing. And what I pointed out before is that even if he had had this judicial hearing and they found that he should stay, the statute says that's not an adjudication that he's mentally ill. But that never happened. There was no adjudication at all because Dr. Plotkin, the psychiatrist, told Mr. Phelps that he was going to have him discharged. So Mr. Phelps withdrew his request for a hearing and he was discharged the next day. So yes, he did invoke his right, but it was cut off through no fault of his own. He still could have pursued it. He chose not to because he was going to be getting out soon. I think the New York courts would hold that after he was released that such a hearing is moot. I don't think he could have pursued that hearing after he was released. He was released the next day. Thank you, counsel. We'll reserve decision.